IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TAJ BECKER, M.D.,<br><br>    Plaintiff,<br><br><br><br><br>       vs.<br><br><br>J. DENIS KROLL, et al.,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON RETALIATION AND CONSPIRACY CLAIMS<br><br><br><br><br>Case No. 2:02-CV-24 TS |

## I.  INTRODUCTION

Pursuant to the Tenth Circuit's opinion,[1] Plaintiff's claims of retaliation and conspiracy against several defendants were remanded for further consideration on summary judgment.[2]  The Court finds that Defendant Kroll is entitled to a combination of qualified immunity and absolute prosecutorial  immunity, that Defendants Van Ballegoie,

---

[1]*Becker v. Kroll*, 494 F.3d 904, 928 (10th Cir. 2007).

[2]State law liable claims against two other Defendants were also remanded. Those claims are subject of a separate Motion for Summary Judgment.

1

Allen and Herbert-Snow are entitled to summary judgment because Plaintiff has not come forward with evidence of their personal participation in the alleged violation of Plaintiff's constitutional right or of retaliatory motive, and that summary judgment should be denied for Defendant Wright.

## II. FACTUAL BACKGROUND

The factual background is thoroughly laid out in the Tenth Circuit's opinion. Those facts are repeated here as needed for context and new facts are set forth as relevant to the present Motion. For the purposes of summary judgment, evidence of the following facts have been proffered by Becker.

In November 1998, Utah's Medicaid Fraud Control Unit (MFCU) was under pressure to make greater recoveries. Defendant Terry Allen, a research analyst for MFCU flagged Plaintiff Becker, a St. George neurologist, as possibly having up-coded Medicaid costs. Up-coding is the practice of overcharging the Medicaid program for services.

In November 1998, Defendant Kroll (MFCU prosecutor who later became an interim director) obtained permission from a state judge to issue a subpoena for Becker's medical records. Defendants Jeff Wright (Chief Investigator for MFCU) and Michelle Hebert-Snow (Medical Investigator for MFCU) served the subpoena on Becker on November 17, 1998. Becker complied with the facially valid subpoena by producing her patients' records for copying. No return of service was ever filed for the subpoena, and MFCU's file failed to mention the subpoena. Instead, Wright's report stated that Becker had voluntarily turned over the records.

2

Herbert-Snow's initial examination of those records concluded that Becker had likely up-coded.  However, Herbert-Snow told Wright that she was not an expert and her work would have to be reviewed by a physician, preferably by two physicians.

Over the next several months, MFCU conducted settlement negotiations with Becker. During the negotiations MFCU demanded large sums of money from Dr. Becker as reimbursement for the alleged up-coding or MFCU threatened that it would file a criminal complaint against her.  During those negotiations, Becker was threatened with a "parade of horrors" including loss of her licence and livelihood, that she would be reported to the federal government, that she would have to pay amounts up to $640,000, and the threatened criminal action—all if she did not pay the sums demanded by MFCU.  The amount demand was initially $107,000, but the demand amount was later reduced. The initial settlement meeting was attended by Defendants Kroll, Wright, and Herbert-Snow. Becker attended the first meeting alone, as recommended by Defendants. Most of the remaining meetings and conversations were apparently arranged by Kroll and Adolf Becker, Plaintiff's husband who is an attorney.  Becker never agreed to any settlement and always maintained she had correctly coded the Medicaid program billing.  MFCU did not maintain a record of the settlement proceedings.

In June 1999, Kroll filed a civil action against Becker to recover $25,000 in alleged up-coded amounts, plus fines and costs.  However, Kroll dismissed the civil action two weeks later because Becker refused to agree to pay amounts demanded to settle the case.

During this time that MFCU was threatening Becker with a criminal action, MFCU contracted with an independent neurologist, Dr. Vine, to review Becker's records.  Dr. Vine

submitted a report finding no evidence of up-coding.  This exculpatory information was known to Wright, but not included in MFCU's file and was not conveyed to Becker.  Another doctor was then hired to conduct analysis and agreed with MFCU's initial finding that up-coding had likely occurred.

In November 1999, Becker filed a Notice of Claim against the state relating to MFCU's action.  By November and December 1999, Becker and her husband were engaged in speaking out against MFCU by writing and contacting government officials to allege that MFCU employed bullying tactics to extort money from rural doctors and that there was a lack of oversight by MFCU by the Department of Public Safety.  They also alleged that MFCU was ineffective overall and needed to be reformed.  The Beckers' efforts were extensive as shown by the following examples.  In November 1999, the Beckers contacted Kroll with GRAMA[3] requests for extensive information about the program, evidencing her participation in the larger debate about MFCU.  At the end of October, Becker wrote the federal Office of Inspector General with complaints that MFCU personnel, such as Wright, were unqualified and were abusing their positions.   In December 1999, Becker's husband wrote a Utah state senator.  The letter  spoke out to the senator regarding such areas of public concern as MFCU's alleged abuses regarding rural physicians, MFCU's performance over a four year period, its staff, its proposed budget for the upcoming year, and urged that MFCU's tasks be reassigned to another state agency.  The letter was copied to a state representative and the governor.

---

[3]Government Records Access and Management Act, Utah Code Ann. § 63G-2-201.

The Beckers' efforts were part of a larger and on-going political debate at the same time frame that resulted in management changes at MFCU. For example, in July 1999, a Utah senator wrote the Utah Attorney General about his concerns over complaints he had received from doctors about possible abuses.   The Utah Medical Association also made a request for information about the fraud unit, the number of physicians it investigated, and the amounts collected.   There were public meetings where MFCU was criticized.  Shortly afterwards, as a result of the larger political debate in which the Beckers and others participated, the state moved MFCU from the Department of Public Safety to the Attorney General's office.  Kroll became interim director and David Gardner was appointed as new lead prosecutor.  Kroll was eventually transferred out of MFCU.  Kroll was still director when the criminal complaint was filed against Becker, but was transferred before the preliminary hearing.

Kroll and Wright were aware of the public criticism, and were aware that the Beckers were vocal in joining the public debate and criticism of MFCU.  Wright was not just aware of the Beckers' role in the public criticism of MFCU and their specific criticism of his performance at MFCU, he admitted he was affected by that public criticism.  Defendant Van Ballegoie testified that non-specific employees at MFCU heard that Becker was pursuing an action against MFCU and that fact was brought up in weekly staff meetings.

Gardner was new to MFCU and based his decision to file charges on Wright's follow-up reports and other information from the file.  The file did have the reports of two doctors.   However, the file and Wright's reports lacked any reference to the original subpoena, to Dr. Vine's analysis, and to the details of the settlement negotiation meetings

where Becker was asked to pay specific sums of money or be criminally prosecuted, lose her licence, etc.  Not only was the information about Dr. Vine's report not included in the file, Wright told Gardner that the investigators had seen a Dr. Vine, but that Dr. Vine "had nothing to do with the case, wasn't qualified or didn't do anything."[4]  Gardner took Becker's file to the Criminal Prosecution Committee of the Attorney General's Office on several occasions. Kroll sat on this committee at least once or twice when Becker's case was discussed.  Kroll was at Gardner's earlier appearances with the screening committee, not the later ones.  Gardner also discussed the case with several other prosecutors and his supervisor.  Because Gardner was missing key information, such as the existence of the exculpatory Vine report, that key information was not conveyed to those Gardner consulted with about filing the charge against Becker.

In January 2000, Becker's husband testified before a legislative committee regarding MFCU. Shortly thereafter, on January 11, 2000 Gardner filed the criminal charges.

On July 12, 2000, a preliminary hearing was held in Becker's criminal case.   At the hearing, Judge Lindberg of the Third District of Utah found probable cause after the state had put on its evidence.  However, immediately after binding Becker over, Judge Lindberg acknowledged that she "probably acted prematurely" and told Becker that she had the right to present her defense.[5]  Becker's attorney responded that they would not put on a defense

---

[4] Pl.'s Ex. I, 23: 11-13.
[5] Def.'s Ex. I, Trans. of Preliminary Hearing Proceedings, 360. Specifically Judge Lindberg stated, "I believe the State has provided sufficient evidence on each of those elements and, accordingly, I bind you over." Becker responded, "Thank you, Your

"knowing where the Court is going with this or has gone with this."[6]  Having just learned of

Dr. Vine and his report, Becker's counsel decided not to try to call in Dr. Vine and another

doctor as witnesses, but that it was a better strategic decision to file motions to suppress.[7]

 Becker entered a plea of not guilty.

According to Gardner, Wright's testimony at the preliminary hearing was the first

time that Gardner learned that Wright had sent the records to Dr. Vine, a fact entirely

absent from the investigative file.[8]  Gardner also learned for the first time that the Vine

report was exculpatory and had not been provided to Becker.

The Third District Court's minute entry for the preliminary hearing was not

contemporaneously signed or stamped.  Over a year after the hearing, Becker obtained

a copy of the court file and the minutes were unsigned at that time.  However, the Attorney

General's office subsequently obtained a signed and stamped minute entry for purposes

of this case.  The Third District Court clerk testified in a deposition that she stamped the

judge's name when someone came to request a copy of the minutes because she thought

the person requesting it would need it signed and stamped.

_____

Honor."  Then Judge Lindberg said, "Now, counsel did not put this on the record, but I
do want you to understand—and maybe I acted too soon beforehand, you have a right
to take the stand.  To testify, if you wish.  And—and I probably acted prematurely in
doing this bind over because I do want you to know that you have the opportunity to do
that, if you wish.  And I'm sure counsel advised you as to whether or not he
recommended that you do so or not but, for the record, counsel, did you address that
issue with your client?" *Id.*
    [6] *Id*. at 361.
    [7] *Id.*
    [8] The record does not contain the portion of the transcript of the preliminary
hearing containing Wright's testimony.

Approximately two months after the preliminary hearing, Gardner dismissed the criminal complaint against Becker with prejudice.  Gardner then referred the matter of the alleged up-coding to an administrative action, where it was determined that Becker owed nothing, effectively clearing her of the up-coding allegations.

Gardner gave three reasons for dismissing the case.  One, contrary to what Wright's follow-up report stated, Becker's records had not been obtained voluntarily, but rather by subpoena.  Further, the return of service for that subpoena had not been filed as required by state law.  Two, Gardner learned that, contrary to what Wright had told him, Dr. Vine had been involved in the case at MFCU's request, and had submitted an exculpatory report.  Three, Wright's files had not made any documentation of the negotiation meetings or statements made therein.

Most significantly, when asked about whether it would have impacted his decision to prosecute Becker if he had know the information Wright withheld from him about Dr. Vine exculpatory report, Gardner replied: "it would have."[9]

## III.  PROCEDURAL BACKGROUND

Becker filed this action under §1983 and state law.  The Court previously granted Defendants' Motion for Summary Judgment on all claims.   The Tenth Circuit affirmed in part but reversed and remanded the First Amendment retaliation claims.  It explained:

> To establish a § 1983 retaliation claim against non-immune officials, Becker must plead and prove (1) that she was engaged in a constitutionally protected activity; (2) that a defendant's action caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in

---

[9] Pl.'s Ex. I at 38:25.

that activity; and (3) that a defendant's action was substantially motivated as a response to her exercise of her First Amendment speech rights. She also must plead and prove the absence of probable cause for the prosecution.[10]

The Tenth Circuit noted that the requirement that there be a lack of probable cause was announced in *Hartman v. Moore*,[11] a decision issued after this Court's summary judgment ruling, "so neither the parties nor the district court had the opportunity to directly address the absence of probable cause in the retaliatory prosecution context."[12]    The Tenth Circuit further stated:

> We believe the record on appeal presents a possible inference of retaliatory action. To survive summary judgment on the retaliation claim, Becker must present a genuine issue of material fact as to whether a non-immune defendant influenced the decision to prosecute in retaliation for protected speech. Viewing the facts in the light most favorable to Becker, we can infer the following from the record: (1) in November and December of 1999, Becker began speaking out about MFCU by filing a Notice of Claim against the state and writing to state lawmakers; (2) Becker's speech was part of a larger political debate around the same time that resulted in management changes at MFCU: in December 1999, Gardner became the MFCU lead prosecutor and sometime thereafter, the state legislature transferred oversight of MFCU from the Department of Public Safety to the Attorney General's office; (3) some defendants stated at their depositions that they were aware of the public criticism and at some point were aware of Becker's planned litigation against the state; (4) while Gardner was reviewing Becker's case, he discussed the investigation with some defendants; (5) these defendants may have withheld information about the investigation from Gardner; (6) as a result, Gardner did not have complete information about the Becker investigation before he made the decision to file charges; and (7) if Gardner had complete information, he would not have filed criminal charges in January 2000.

> If Becker has established a genuine issue of material fact as to the points above against defendants not entitled to immunity, her retaliation

---

[10] *Becker*, 494 F.3d at 925 (citation omitted).
[11] *Becker*, 547 U.S. 250  (2006).
[12] 494 F.3d at 925.

claim may be able to proceed to a jury.  The district court's summary judgment order did not discuss Becker's theory of retaliation by non-immune defendants who may have induced the prosecution by withholding key evidence from Gardner.  Neither did it address the role particular defendants played in influencing Gardner's decision.[13]

## IV.  SUMMARY JUDGMENT MOTION

### A.  Parties' Positions

On remand, Defendants Kroll, Van Ballegoie, Allen, Herbert-Snow and Wright move for summary judgment on retaliation and conspiracy regarding the retaliatory inducement to prosecute claim and any related conspiracy claim.[14]  Defendants assert qualified immunity for each Defendant.  Defendants contend that Plaintiff has failed to show a violation of her constitutional rights because (1) the Third District court found probable cause for the bindover; (2) there is no evidence of a retaliatory motive by any individual Defendant; (3) there is no showing that any Defendant's actions had anything but a nominal role in the decision to prosecute.

Plaintiff contends that there is no probable cause because the Third District Court's bindover order is invalid as unsigned and that there are issues of fact that create inferences of retaliatory motive and conspiracy.

### B.  Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights

---

[13] *Id*. at 926 (citation omitted).
[14] The dismissal of the other conspiracy claims was affirmed on appeal.

of which a reasonable person would have known.'"[15]  The doctrine balances accountability of government officials who act irresponsibly with shielding government actors from harassment and distraction when their actions are reasonable.[16]

When the defense of qualified immunity is raised the burden of proof shifts to the plaintiff.[17]  This "heavy burden" is satisfied if the record shows (1) "the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "the right at issue was clearly established at the time of defendant's alleged misconduct."[18]  To satisfy the second step "[o]rdinarily . . . there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[19]

As established in *Pearson v. Callahan*, trial courts may use their discretion "to determine which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[20]

---

[15] *Pearson v. Callahan*, 555 U.S. __, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[16] *Id.*

[17] *Oliver v. Woods*, 209 F.3d 1179, 1185 (10th Cir. 2000) ("If the plaintiff fails to show the defendants violated a constitutional or statutory right, or that the asserted violation was clearly established under the law, the defendant is entitled to qualified immunity.").

[18] *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[19] *Id.* at 1185 (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995)).

[20] 129 S.Ct. 818.

If the plaintiff's alleged facts satisfy the qualified immunity test the burden of proof shifts back to the defendants.[21]

> As articulated by the Supreme Court, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out *on a favorable view of the parties' submissions*, the next, sequential step is to ask whether the right was clearly established."[22]

As an initial matter, the Court notes that Defendants do not argue that the law was not clearly established at the time the criminal complaint was brought against Becker. Thus, the second prong of the qualified immunity test, requiring the right allegedly violated to be clearly established, is satisfied.

Defendants contend that Plaintiff has not shown the first prong of qualified immunity because she has not shown a violation of a constitutional right.  In support, they argue that the Third District's finding of probable cause establishes that there is not an "absence of probable cause for the prosecution," a necessary element of Plaintiff's claim.  They also argue there is no evidence that the Defendants had a retaliatory motive and that there is no showing that the Defendant's actions were related to the alleged injury she suffered.

Plaintiff argues she has met the requirements set out by the Tenth Circuit by presenting facts on each point it specified as necessary to allow a jury to infer that a non-immune defendant influenced the decision to prosecute in retaliation for protected speech.

---

[21] *Clark v. Edmunds*, 513, F.3d 1219, 1222 (10th Cir. 2008); *see also Oliver*, 209 F.3d at 1185 (quoting *Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995)).

[22] *Weigel v. Broad*, 544 F.3d 1143, 1150 (10th Cir. 2008) (quoting *Saucier*, 533 U.S. at 201) (emphasis added in *Weigel*).

The Court will first address the potentially dispositive issue of whether the Third District's bindover is irrefutable evidence of probable cause and if issue preclusion applies to the probable cause finding of the Utah District Court.

As noted above, the "absence of probable cause for the prosecution" prong was recently added by the U.S. Supreme Court in *Hartman v. Moore*, and one of the reasons for the remand was to allow this Court and the parties to address it on summary judgment. If issue preclusion applies to the probable cause finding of the state court, then Plaintiff cannot satisfy her burden and Defendants' motion for summary judgment for retaliation should be granted.

Defendants argue the *Rooker-Feldman* Doctrine[23] bars Plaintiff from challenging the Utah District Court's finding of probable cause.[24]   However, *Rooker-Feldman* does not apply in the circumstances of this case.

> *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine." Thus, "[i]f a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.[25]

---

[23] "The *Rooker-Feldman* doctrine prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings commenced." *Lance v. Dennis*, 546 U.S. 459, 460  (2006).

[24] Defendants rely on the reasoning in *Warnick v. Briggs*, 2007 WL 3231609 (D. Utah Oct. 30, 2007). The Court finds that case inapposite as it involved findings made at a juvenile court's shelter hearing.

[25] *Silvan W. v. Briggs*, 2009 WL 159429, 3 (10th Cir. Jan. 23, 2009) (quoting Exxon Mobil Corp. V. Saudi Basic Indus. Corp., 554 U.S. 280, 284, 293 (2005)).

In a similar case, *Bell v. Dillard Department Stores, Inc.,*[26] the Tenth Circuit considered the effect of a preliminary hearing finding of probable cause.  The Tenth Circuit examined the effect under the doctrine of issue preclusion, not the *Rooker-Feldman* doctrine, ultimately finding that an unsigned minute entry did not have preclusive effect under Oklahoma law.[27]  Thus, the effect of the prior state court determination of probable cause on the issue of a "lack of probable cause for prosecution" prong should be analyzed under the doctrine of issue preclusion.

In considering issue preclusion, the Court looks to state law.  "Pursuant to 28 U.S.C. § 1738, a federal court must give the same full faith and credit to state judicial proceedings 'as they have by law or usage in the courts of such State . . . from which they are taken.'"[28] Thus, in determining issue preclusion the law of the court that issued the final order governs.[29]

---

[26] 85 F.3d 1451 (10th Cir. 1996).

[27] *Id*. at 1453-54.

[28] *Id*. at 1453.

[29] *Dixon v. Richer*, 922 F.3d 1456, 1459 (10th Cir. 1991) ("'Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so . . ..'" (citing *Allen v. McCurry*, 449 U.S. 90, 96 (1980)).

Unlike the cases cited by Defendant,[30] which involve state law other than Utah, under Utah law a bindover decision "has no final preclusive effect."[31]   This rule was established by the Utah Supreme Court decision, *State v. Humphrey,*[32] and clarified in the Supreme Court decision *Ford v. State*.[33]   Under the Utah Constitution, bindover orders "shall" be issued by magistrates.[34]   Consequently, when a district judge issues a bindover order, he or she is acting as a magistrate and not as a judge of a court.[35]   In essence the judge takes off his or her judge hat and puts on his or her magistrate hat.[36]   *Humphrey* held that a magistrate's orders were not immediately appealable and bindover orders could be reviewed by the trial judge in a motion to quash.[37]   *Ford* reiterated this: "[T]he magistrate decides nothing more than that the case will proceed. As noted in *Humphreys*, that decision has no final preclusive effect."[38]

---

[30] *Hoffman v. Martinez*, 92 Fed. Appx. 628, 631-32 (10th Cir. 2004) (malicious prosecution case applying New Mexico law, and quoting *Weststar Mortgage Corp. v. Jackson*, 133 N.M. 114, 61 P.3d 823, 832 (N.M. 2002) as holding "that a judicial determination to bind a plaintiff over for a criminal trial constitutes prima facie evidence of the existence of probable cause for detention"); *Gouskos v. Grifith*, 122 Fed. Appx. 965, 971 (10th Cir. 2005) (finding that under Oklahoma law "a finding of probable cause made at the preliminary hearing in a criminal case proves prima facie defensive evidence in a subsequent civil case that a false arrest claim should be dismissed"); *Thompson v. City of Lawrence, Kan.*, 58 F.3d 1511, 1515-16 (10th Cir. 1995) (applying Kansas law). Another case cited by Defendant *Tinsley v. Treat*, 205 U.S. 20 (1907) is inapposite as it involves a probable cause determination by the return of an Indictment.

[31] *Ford v. State of Utah*, 199 P.3d 892, 896 (Utah 2008).

[32] 823 P.2d 464 (Utah 1991).

[33] 199 P.3d 892 (Utah 2008).

[34] *Ford*, 199 P.3d at 895 (quoting Utah Const. art. 1 § 13) (emphasis added).

[35] *Humphrey*, 823 P.2d at 467.

[36] *State v. Jaeger*, 886 P.2d 53, 54 n.2 (Utah 1994).

[37] *Humphrey*, 823 P.2d at 467–68.

[38] *Ford*, 199 P.3d at 896 (internal citations omitted).

Further, in determining what, if any, weight should be given to the commitment by a magistrate, the court should take into account evidence of "undue means in procuring a magistrate to bind over a defendant."[39]

Accordingly, Plaintiff is not precluded from showing a lack of probable cause by the Utah District Court's bindover order.  Despite the fact that Judge Lindberg conducted the preliminary hearing and retained the case for trial, she was acting as a magistrate during the preliminary hearing.  Accordingly, the Court need not address the parties' arguments regarding the unsigned minute entry.

Because there is no preclusive effect of the bindover order, Plaintiff is not precluded from presenting her evidence from which a jury could infer that the prosecution lacked probable cause.   In this case, Gardner testified that had he known of the information withheld from him, especially the Vine report, it would have impacted his decision to prosecute. Shortly after he did obtain the withheld information, Gardner dismissed the charges.  From this, a reasonable jury could infer a lack of probable cause had one or more of the Defendants not induced the prosecution by withholding key evidence from Gardner.

C. Individual Defendants

The Court will address together Defendants' arguments that there is no evidence of a retaliatory motive by each Defendant and that there is no showing that each Defendant's actions had anything but a nominal role in the decision to prosecute. Individual

---

[39]*Olson v. Independent Order of Foresters*, 324 P.2d 1012, 1014 (Utah 1958) (malicious prosecution case).

liability under 42 U.S.C. § 1983, must be based upon personal participation of the individual in the alleged constitutional violation.[40]   Plaintiff claims her free speech rights were violated when the non-prosecuting defendants acted in retaliation and induced the prosecutor to bring charges he would not otherwise have brought, and that those free speech rights were clearly established.

In *Hartman*, the Supreme Court explained:

> A *Bivens* (or § 1983) action for retaliatory prosecution will not be brought against the prosecutor, who is absolutely immune from liability for the decision to prosecute, instead, the defendant will be a nonprosecutor, an official, like an inspector here, who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for *successful retaliatory inducement to prosecute*.  The consequence is that a plaintiff . . . must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging.[41]

"Any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom."[42]   Inducing prosecution fits within the court's definition of "any form of official retaliation."   The Court finds that Plaintiff's efforts to encourage additional governmental oversight, reform, transfer, or the abolishment of MFCU included free speech activities.

---

[40]*Whitington v. Ortiz*, 2009 WL 74471, *10 (10th Cir. Jan. 13, 2009).
[41] *Hartman*, 547 U.S. at 262 (footnotes and citations omitted) (emphasis added).
[42] *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (quoting *Lackey v. County of Bernalillo*, 1999 WL 2461, *3)).

17

1.   <u>Wright</u>

As set forth above, Wright was aware of Becker's First Amendment activities and was affected by it.  Wright played more than a nominal role in inducing Gardner's decision to file a criminal complaint.   Gardner met with him about the case.   Wright's report incorrectly indicated that the information obtained by subpoena was given voluntarily by Dr. Becker.  The fact that it was subpoenaed was key information that Wright withheld from Gardner and that withheld fact would have impacted his decision.  Similarly, if Wright had told Gardner about the Vine report, it would have affected his decision to prosecute.  But more than withholding the Vine report, Wright actually told Garner that Dr. Vine was not involved in the case.  This false statement to Gardner had to have occurred after Garner was appointed prosecutor in December 1999.  Accordingly, it was after Becker filed her Notice of Claim and during the time that the Beckers were engaged in the larger public debate about the MFCU—facts Wright admits affected him.  This withholding of evidence from the prosecutor had a snowball effect in that the evidence was then not presented to the persons from whom Gardner sought advice regarding prosecution.

Plaintiff has shown evidence as to Wright on all of the points set forth by the Tenth Circuit as establishing a possible inference of retaliation by influencing the decision to prosecute in retaliation for protected speech.  A jury may infer that Wright exerted influence over the decision to prosecute by withholding information and giving false information.

Plaintiff has shown actions by Wright that caused her to suffer an injury—a retaliatory prosecution—which would chill a person of ordinary firmness from continuing to engage in the public debate about MFCU.   It is not required that it did chill her from the

actions, only that it would have chill a person of ordinary firmness.  Summary judgment on the basis of qualified immunity will, therefore, be denied as to Wright.

2.  Allen

Allen conducted an initial statistical analysis of the database that showed unusual billing by Dr. Becker and discussed the evidence with Gardner.  However, there is no evidence which intimates that Allen withheld information from Gardner.   There is no showing that Allen was aware of or was motivated by Becker's planned litigation against the state or the Beckers' participation in the larger public debate about MFCU.  Plaintiff has not shown evidence that Allen's statistical analysis was influenced by Becker's exercise of her First Amendment rights because that analysis occurred well before she began speaking out in the public debate against MFCU and before she filed her Notice of Claim.  Plaintiff has, therefore, failed to show evidence of a retaliatory motive by Allen.  Plaintiff has also not shown that Allen's actions caused Plaintiff injury.

Plaintiff has not shown a violation of her constitutional right by Defendant Allen.  Allen is entitled to qualified immunity and summary judgment will be granted in his favor.

3.  Van Ballegoie

Van Ballegoie has denied having any role in this investigation and Gardner does not contradict that statement.   Plaintiff has not shown that Van Ballegoie's actions caused Plaintiff injury.  Therefore, Plaintiff has not shown a violation of a constitutional right by Van Ballegoie and he is entitled to qualified immunity and summary judgment will be granted in his favor.

19

4.  <u>Herbert-Snow</u>

Herbert-Snow accompanied Wright to serve the subpoena, conducted the initial MFCU analysis, and attended the first negotiation meeting with Dr. Becker. However, there is no evidence that she participated in the investigation beyond that point or that she falsified her analysis in any way.  Plaintiff has failed to show that Herbert-Snow's actions caused Plaintiff injury or that they were motivated by retaliation for the exercise of Becker's First Amendment rights.   Therefore, Plaintiff has failed to show a violation of a constitutional right by Herbert-Snow and she is entitled to summary judgment.

5.  <u>Kroll</u>

Kroll was the lead prosecutor when the investigation extending to December 1999. The recent U.S. Supreme Court decision *Kamp v. Goldstein*[43] impacts this case because it clarified prosecutorial immunity.  In that case, the plaintiff sued the supervisors of a district attorney for failing to properly train prosecutors and failing to develop an informational system that would have ensured disclosure of impeachment information about a witness that testified against the plaintiff in a criminal trial. Specifically, the plaintiff claimed the prosecutors violated a "constitutional duty to insure communication of all relevant information on each case . . . to every lawyer who deals with it."[44]

The Court expanded prosecutorial immunity to apply to prosecutor administrators, stating that "supervisory prosecutors are immune in a suit directly attacking their actions

---

[43] 129 S.Ct. 855 (2009).
[44] *Id.* at 859 (quoting *Giglio v. U.S.*, 405 U.S. 150, 154 (1972)).

related to an individual trial."[45]  This rule applies to error in general training of prosecutors that may affect individual cases.  The policy is that supervisors should not be forced to consider possible civil consequences when determining whether or not to prosecute a case or implement programs that will affect how cases will be prosecuted.[46]  The Supreme Court stated that activities such as "workplace hiring, payroll administration, [and] the maintenance of physical facilities" are not given absolute immunity, but activities "determining what information should be included in the training or the supervision" are afforded immunity.[47]  In short, any action or decision that is "directly connected with the prosecutor's basic trial advocacy duties" is afforded immunity.[48]

Under *Kamp*, Kroll is entitled to absolute prosecutorial immunity for any administrative actions "directly connected with the prosecutor's basic trial advocacy duties."[49]  The Court finds that all of his alleged actions prior to his transfer are subject to immunity.

Following his transfer, he sat on two early screening committees and discussed the case with Gardner.  To the extent that he, as the former prosecutor, discussed his prior prosecutorial actions and decisions directly connected with the prosecutor's trial advocacy duties with his successor, his actions are covered by prosecutorial immunity.

---

[45] *Id.* at 862.

[46] *Id.* at 862–63.

[47] *Id.* at 862.

[48] *Id.* at 863.

[49] *Id.*

As to his actions solely in his new role as interim director, there is no evidence that Kroll knew of the Vine report before it was revealed at the preliminary hearing. Kroll did discuss with Gardner the fact of the negotiations with Becker, but his participation in those discussions, and his conveying of the information of his prosecutorial actions to his successor are part of his prosecutorial function. Although Kroll was aware of Becker's exercise of her First Amendment rights, there is no evidence that, between the time he was transferred and the filing of criminal charges, his actions caused Plaintiff's injury. There is no evidence that he influenced or induced the prosecutor to bring charges that would not have been initiated without his efforts acting in his new role as director. The Court finds that Kroll is entitled to both qualified immunity and absolute prosecutorial immunity.

C. Conspiracy

Plaintiff does not address the specifics of her conspiracy claim. Therefore, she has not met her burden of opposing Defendants' claim of qualified immunity on the conspiracy claim and summary judgment will be granted.

## V. ORDER

Based on the foregoing, it is

ORDERED that Defendants' Motion for Summary Judgment (Docket No. 208) on the conspiracy claim is GRANTED to Defendants Van Ballegoie, Allen, Herbert-Snow, Kroll, and Wright. It is further

ORDERED that Defendants' Motion for Summary Judgment (Docket No. 208) on the basis of qualified immunity is GRANTED as to Defendants Van Ballegoie, Allen, and Herbert-Snow, and DENIED as to Wright. It is further

ORDERED that Defendants' Motion for Summary Judgment (Docket No. 208) on the basis of a combination of qualified immunity and prosecutorial immunity is GRANTED as to Defendant Kroll.

DATED   March 26, 2009.

BY THE COURT:

_____

TED STEWART
United States District Judge